**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------X
MUHAMED SACIRBEY,               :
                                     :
             Petitioner,    :   05 Cv. 2949 (BSJ)(FM)
                                       :
          v.                  :
                                       :   **OPINION & ORDER**
JOSEPH R. GUCCIONE, United States  :
Marshal for the Southern District  :
of New York,                  :
             Defendant.     :
-----------------------------------X
**BARBARA S. JONES**
**UNITED STATES DISTRICT JUDGE**

## INTRODUCTION

       Muhamed Sacirbegovic, also known as Muhamed Sacirbey
("Sacirbey"), petitions this Court for a writ of habeas
corpus pursuant to 28 U.S.C. § 2241, seeking relief from a
certification of extraditability issued by the Honorable
Frank Maas, United States Magistrate Judge for the Southern
District of New York.

       Following a hearing, Judge Maas determined that
Sacirbey was extraditable to the Federation of Bosnia and
Herzogovina ("BiH") based on his alleged violation of Abuse
of Official Position or Authority ("abuse of authority"),
under former Article 358 of the BiH criminal code.[1]
Sacirbey claims that the certificate of extraditability
should be vacated on the grounds that he has not been

---

[1] In 2003, this provision was amended and recodified at Article 359.

charged with an extraditable offense under the governing treaty, and that his extradition would violate his right to due process.  For the reasons below, Sacirbey's petition is DENIED.

**BACKGROUND**

**A.   Sacirbey**

Sacirbey was born in 1956 in Sarajevo, Yugoslavia.  He became a naturalized United States citizen in 1973.  From 1992 until late 2000, Sacirbey served as ambassador to the United Nations for BiH.[2]  As ambassador, he had signature authority over the financial account of BiH's Permanent Mission to the United Nations ("Mission").  *See In re Sacirbegovic*, No. 03 Cr. Misc. 01 (FM), 2005 WL 107094, (S.D.N.Y. Jan. 19, 2005) (the "Extradition Order"), at ** 3-4.

In 1993, Sacirbey successfully advocated for the creation of the International Tribunal for the Former Yugoslavia ("ICTY").  From 1993 until 2001, he served as BiH's agent before the International Court of Justice

---

[2] Formerly one of the six federal units constituting the Socialist Federal Republic of Yugoslavia, BiH became an independent state following a referendum for independence from Yugoslavia in 1992.  The new nation almost immediately became embroiled in the warfare that had erupted following the declarations of two other former federal units, Croatia and Slovenia, of their independence from Yugoslavia.  *See* http://en.wikipedia.org/wiki/Bosnia-Herzegovina#The_Bosnian_War, last visited July 17, 2006 (citing N. Malcolm, *Bosnia: A Short History*, New York University Press (1994), ISBN 0-8147-5520-8).

("ICJ").  In that capacity, he managed BiH's case against
Serbia for alleged war crimes committed during the 1992-
1995 conflict between BiH and Yugoslavia.  See *id.*, at
** 6-7 (citations omitted).

Sacirbey also served as BiH's foreign minister from
early 1995 until early 1996, during which time he played an
important role in the negotiation of the Dayton Peace
Accords, which provided the framework for peace in BiH.[3]
*See id.*, * 7 (citations omitted).

**B.   Sacirbey's Alleged Wrongdoing**

On April 11, 2001, the Cantonal Prosecutor's Office in
Sarajevo submitted a Demand for Investigation (the
"Demand") to the Cantonal Court.  (*See* Demand, Sacirbey
Appendix ("App.") Ex. 18.)  The Demand alleges that
Sacirbey had abused his official position as BiH's
ambassador in violation of Article 358 of the BiH Criminal
Code.[4]  (*Id.*)  In support of that charge, the Demand alleges

---

[3] As a result of the 1995 Dayton Accords, BiH is currently supervised by
a High Representative selected by the United Nations Security Council.
The country is administratively divided into two multiethnic
constituent entities: BiH and the Republic of Srpska.  Within these
entities are numerous Cantons, similar to municipalities or counties in
the United States.  *See* United States Dep't of State, Summary of the
Dayton Peace Agreement on Bosnia-Herzegovina, Nov. 30, 1995.

[4] Article 358 of the 1998 BiH criminal code, entitled "Abuse of
Official Position or Authority," provides in relevant part:

(1) An official or responsible person who, by taking
advantage of his/her office or official authority, exceeds
the limits of his/her official authority or fails to

that "there is a well founded suspicion" that during the
relevant time, Sacirbey had "taken advantage of his
official position or authority in the performance of his
duties for the illegal use of the funds of [the] Mission
and of the General Consulate of [BiH] in New York, USA, as
a result of which he has withdrawn cash by means of issuing
checks and bank orders for cash payable to him or by means
of transferring funds to his own private account, due to
which he caused the total shortage in the amount of US
$610,982.46." (*Id.*)[5]  The Demand further alleges that $1.8
million was missing from an investment account over which
Sacirbey also had signature authority.  (*Id.*)[6]

On August 20, 2001, the Cantonal Court responded to
the Demand by issuing a Decision to Investigate Sacirbey.
(*See* Decision to Investigate, App. Ex. 18.)  The Decision
to Investigate concluded that there was "a founded

_____

execute his/her official duty, and thereby acquires a
benefit to himself or herself or to another person, or
causes damage to a third person or seriously violates the
rights of another, shall be punished by imprisonment
. . . .

[5] A commission that investigated the matter ultimately determined that,
all told, approximately $1.3 million of Mission funds were unaccounted
for -- $610,000 of which was attributable to consular fees that should
have been remitted to the BiH Treasury, and the remainder attributable
to regular subsidies of the BiH Ministry of Foreign Affairs.  *See*
Extradition Opinion, 2005 WL 107094, at * 5.

[6] This $1.8 million was eventually determined not to be part of the
Mission's deficit because the funds in that account had been donated by
Saudi Arabia and did not belong to the Ministry.  *See* Extradition
Opinion, 2005 WL 107094, at * 5.

suspicion" that Sacirbey, by making "illegal use of the funds of [the] Mission and of the General Consulate of [BiH]," committed "the criminal act of abuse of official position or authority, which is punishable pursuant to Article 358 . . . ." (*Id.*)

On December 5, 2001, the Cantonal Court issued a Decision for Detention and an International Arrest Warrant for Sacirbey. (*See* App. Exs. 20-21.)

**C.   The Extradition Order**

**1.   BiH's Extradition Request**

On January 29, 2002, the BiH Ministry of Civil Affairs and Communication submitted to the Unites States Department of Justice a request for Sacirbey's extradition (the "Request"). (*See* Request, App. Ex. 17.)  The Request relies on an extradition treaty executed in 1902 by the United States and the Kingdom of Serbia (the "Treaty"). (*Id.*)  Article I of the Treaty provides:

> The Government of the United States and the Government of Servia [as it was then transliterated] mutually agree to deliver up persons who, having been charged with or convicted of any of the crimes and offenses specified in the following article, committed within the jurisdiction of one of the high contracting parties, shall seek an asylum or be found within the territories of the other: Provided, that this shall only be done upon such evidence of criminality as, according to the laws of the place where the fugitive or person so charged shall be found, would justify his or her

apprehension and commitment for trial if the crime or offense had been committed there.

(*See* Treaty, Art. I, App. Ex. 6, at Ex. A).

Honoring BiH's Request, the Department of Justice on March 17, 2003, filed in this Court a Complaint for Arrest with a View Towards Extradition. (*See* Complaint, App. Ex. 6.)[7]

### 2. *The Extradition Hearing*

On December 23, 2003, Judge Maas held an evidentiary hearing to determine whether Sacirbey could be extradited pursuant to the Complaint filed against him.

### a. *The Government's Case*

The Government's case consisted entirely of documentary evidence, including: (i) the Cantonal Court's August 20, 2001 Decision to Investigate (App. Ex. 19); (ii) the Cantonal Court's decisions concerning Sacirbey's detention and arrest (App. Exs. 20-21); and (iii) the sworn witness statements of Hazima Razanica ("Razanica"), Haris Lukovac ("Lukovac"), and Ivika Misic ("Misic") (App. Exs. 22-24). *See* Extradition Order, 2005 WL 107094, at ** 3-5.

Razanica, a Finance Officer at the Ministry of Foreign Affairs responsible for auditing the Mission's books, allegedly discovered that Sacirbey had made various

---

[7] Sacirbey was arrested and detained in March 2003, and was released on bail in July 2004.

expenditures on his personal credit card and had collected
advance sums of consular monies without accounting for
them.  During Razanica's visit to the Mission in 2000, she
allegedly learned that the Mission was not able to account
for its regular expenses due to a lack of funds.  According
to Razanica, Sacirbey also told Razanica that he would not
show her the necessary documents and alleged authorization
for his expenditures, but would show these documents to BiH
officials in Sarajevo to whom he answered.  Sacirbey also
allegedly told Razanica that he lacked documentation
relating to certain expenditures such as legal fees, which
he would attempt to obtain and provide to those officials
in Sarajevo.  (*See* Razanica Statement, App. Ex. 22.)

Lukovak, Assistant to the Minister of Foreign Affairs,
also visited the Mission in 2000 for the purpose of
inspecting the Mission's books.  Lukovac met with Sacirbey,
who allegedly stated that he could account for all of the
expenditures.  Sacirbey also allegedly told Lukovac that
Sacirbey would have difficulty obtaining documentation for
fees paid to certain Hague Tribunal lawyers and lobbyists,
and that he would provide whatever documentation he could
within thirty days.  Sacirbey also allegedly said that he
"would be able to provide . . . a certain sum of money" to
the Mission.  After Lukovac's visit, he arranged to provide

15,000 Deutsche Marks ("DM") to the Mission, for use to settle some of its outstanding expenses.  Lukovac was later advised by a Mission bookkeeper, however, that Sacirbey allegedly had diverted the funds.  Lukovac also claims that he had conferred with BiH President Izetbegovic, who stated that he had not authorized Sacirbey's expenditures for BiH's legal representation at the Hague Tribunal.  (*See* Lukovac Statement, App. Ex. 23.)

Misic, a member of a three-member commission assigned to investigate the matter further, summarized the commission's findings that: (i) there were a series of omissions in the Mission's accounting books, such as irregularities in the disposal of funds and excessive and unnecessary expenses; (ii) the Mission had huge debt liabilities; and (iii) the Mission did not transfer any money collected as consular fees (referred to herein as "taxes"), which should have been regularly remitted to the Ministry of Treasury.  Misic further alleged that Sacirbey "did not collect any documents to prove huge expenses," even though he had promised to do so.  According to Misic, Sacirbey also informed the commission that he would be unable to provide documentation for certain large cash payments to lawyers and lobbyists in the Hague.  (*See* Misic Statement, App. Ex. 24.)

### b. *Sacirbey's Case*

Sacirbey's case was comprised of: (i) his own testimony; (ii) the testimony of Paul Robert Williams, a former State Department employee and current law professor at American University; and (iii) declarations of Michael Hartmann, an American attorney currently employed by the United Nations as a prosecutor in Kosovo, who was proffered as an expert on Bosnian criminal law (*see* App. Exs. 30-31.)

Sacirbey testified that he contributed between $600,000 and $800,000 of his own money to the Mission between 1992 and 1995 because financial support from Sarajevo for the Mission's work was haphazard at best. Sacirbey further testified that he was entitled to receive a salary as ambassador, but never collected it.  Sacirbey stated that his authority to spend money for the Mission came "directly from President Izetbegovic . . . [who] said basically in very broad terms, we authorize this."  *See* Extradition Order, 2005 WL 107094, at * 7 (citing hearing transcript).

Sacirbey also testified that his role as BiH's agent before the ICJ brought him into conflict with members of the BiH government, and that his opponents labeled him as a "criminal" and an "embezzler."  In Sacirbey's view, the extradition request was an outgrowth of his support of the

war crimes case.  *Id.*, at ** 7-8 (citing hearing
transcript).

Sacirbey also testified that he had certain enemies as
a result of his relationship with President Izetbegovic.
Indeed, Sacirbey testified that Misic had told him that
Sacirbey was being targeted in an effort to secure his
cooperation in making a case against President Izetbegovic,
which Sacirbey declined to do.  Based on this conversation,
Sacirbey considered the present extradition proceeding part
of the effort to "go after President Izetbegovic."  *Id.*, at
* 8 (citing hearing transcript).

Sacirbey also testified about the political
implications of the United Nations investigation into the
massacre of Bosnian Muslims at Srebrenica, which "met all
sorts of opposition . . . from the Bosnian Serbs . . . [and
also] from western capitals, including Washington."
Sacirbey further testified that while he was serving as
United States Ambassador to the United Nations, Richard C.
Holbrooke, a United States diplomat who helped broker the
Dayton Peace Accords, pressured Sacirbey and others to
abandon the ICJ genocide case and "came down very hard" on
Sacirbey at Dayton for "call[ing] for Milosevic's
indictment."  Sacirbey theorized that Holbrooke and others
close to him might have played a role in the commencement

of this proceeding against Sacirbey.  *Id.* (citing hearing transcript).

Sacirbey also testified that he provided President Izetbegovic with a yearly accounting of the expenses incurred in connection with the genocide case before the ICJ, although he expressed uncertainty as to whether President Izetbegovic had received complete documentation concerning the expenditures.  He also testified that the Mission's back-up set of documents was sent to President Izetbegovic and that Sacirbey had not kept any duplicates. *Id.* (citing hearing transcript).

Williams, who was called to testify on Sacirbey's behalf, stated that Sacirbey's work with the ICJ was opposed by Momcilo Krajisnik and others in the international community, including Slobodan Milosevic, the former President of the Federal Republic of Yugoslavia, who wanted the case before the ICJ dismissed.  Williams further contended that there were United States officials who shared that goal because they feared that the ICJ might conclude, as Sacirbey alleged, that certain of the participants in the Dayton talks -- including the United States -- were willing to overlook past acts of genocide against Bosnians in order to secure an agreement concerning BiH's governance.  Indeed, as Williams noted, Sacirbey and

11

others contended that certain United States allies had failed to prevent a massacre in the town of Sresvernizca in 1995 in furtherance of that goal.  Williams suggested that the charges against Sacirbey may have been brought in an effort to discredit Sacirbey.  As Williams explained, after Sacirbey left office, the party controlling the BiH government changed hands, and the new party, "which was the former communist party, essentially recloaked, had a very specific motive in going after members of the former regime to discredit them for political reasons."  *Id.*, at * 6 (citing hearing transcript).

In his papers opposing extradition, Sacirbey principally argued that: (i) no valid extradition treaty exists between the United States and BiH; (ii) even if BiH succeeded to the 1902 Treaty between the United States and Serbia, the offense of abuse of authority is not an extraditable offense under the Treaty; (iii) he is merely wanted for questioning, and has not been formally "charged" with an extraditable offense; (iv) the Government failed to demonstrate the requisite "dual criminality," *i.e.*, that Sacirbey's alleged conduct is criminal under the laws of both BiH and the United States; (v) the Government failed to sustain its burden of demonstrating probable cause; and

(vi) the "political character" exception in the Treaty
applies to the crime alleged against him in any event.[8]

### 3.  Judge Maas's Decision

On January 19, 2005, Judge Maas granted the
Government's extradition request, and on January 25, 2005,
issued a Certification of Extraditablity.  (*See*
Certification, App. Ex. 61.)  First, Judge Maas found that
BiH had succeeded to the obligations of the Treaty, as
evidenced by a 1992 letter from the BiH president to the
State Department, as well as the fact that BiH was relying
on the Treaty in connection with its request to extradite
Sacirbey.  *See* Extradition Order, 2005 WL 107094, at ** 10-
11.

Second, with respect to Sacirbey's contention that the
offense of abuse of authority does not provide a basis for
extradition, Judge Maas determined that the offense is
sufficiently equivalent to "embezzlement by public
officers," which is expressly enumerated as an extraditable
offense under the Treaty.  *See id.*, at ** 12-15.

---

[8] Article VI of the Treaty provides:
> A fugitive criminal shall not be surrendered if the offense
> in respect of which his surrender is demanded be of a
> political character, or if he proves that the requisition
> for his surrender has, in fact, been made with a view to
> try to punish him for an offense of a political character.
(Treaty, Art. VI.)

Third, in addressing Sacirbey's claim that he was not properly "charged" because the proceedings in BiH had not evolved beyond the investigative stage, Judge Maas found that the Treaty does not require a formal charge, such as an indictment.  Rather, Judge Maas explained, "all that need be shown is that [BiH] intends to prosecute" Sacirbey -- an intent which BiH has repeatedly affirmed.  *See* Extradition Order, 2005 WL 107094, at ** 14-16.

Fourth, Judge Maas rejected Sacirbey's contention that the dual criminality requirement was not satisfied.  In this regard, Judge Maas determined that the charged conduct underlying the abuse of authority offense was clearly prohibited by a number of federal criminal statutes, including the embezzlement and theft offenses set forth in 18 U.S.C. §§ 641, 643, 648, and 649.  *See id.*, at ** 17-18.

Fifth, Judge Maas found that the Government had established probable cause, based in large part on the following evidence: (i) there was a significant shortfall in the BiH financial accounts over which Sacirbey had authority; (ii) in the face of an investigation, Sacirbey did not provide details or documentation of various non-routine expenditures; (iii) contrary to Sacirbey's claim, President Izetbegovic expressly denied that he had authorized the expenditures of funds to pursue cases before

14

the international tribunals; (iv) Sacirbey's statement to
Lukovac that he would be able to restore some of the funds
could be construed as an implicit concession that some of
the expenditures were improper; and (v) Sacirbey diverted
the 15,000 DM in emergency funds sent to the Mission.  *See
id.*, at ** 18-19.

Finally, Judge Maas flatly rejected Sacirbey's claim
that his purported offense was of a "political character."
In this regard, Judge Maas explained that the political
character exception is narrow, and generally does not
encompass financial crimes like the one at issue here.  He
further found that for the exception to apply, Sacirbey
would have had to demonstrate -- but did not -- that his
alleged crime was incidental to a war or armed rebellion.
*See id.*, at ** 19-20.

**D.   Sacirbey's Habeas Petition**

Sacirbey filed the instant petition, as amended, on
March 21, 2005.  Sacirbey argues that a writ should issue
on the grounds that: (i) he has not been "charged" with a
non-political offense enumerated in the Treaty; (ii) the
Government failed to meet its burden of demonstrating
probable cause; (iii) Sacirbey was denied due process in
connection with his extradition hearing before Judge Maas;
and (iv) if extradited, Sacirbey may be subject to cruel

15

punishment, and possibly death, in violation of his right
to due process.

This Court heard oral argument on October 4, 2005,
during which Sacirbey argued the above points, and claimed
for the first time that his extradition could not proceed
on the theory that there was no court in BiH seized of the
matter.[9]  This Court requested additional submissions on
this issue, and heard further argument on December 28,
2005.

### STANDARD OF REVIEW

Where a certificate of extraditability has issued, the
extraditee's only recourse is to seek collateral review by
way of habeas corpus.  *See Ahmad v. Wigen,* 910 F.2d 1063,
1065 (2d Cir. 1990).  The habeas court's review is limited
to inquiring "[1] whether the magistrate had jurisdiction,[10]
[2] whether the offense charged is within the treaty and,
[3] by a somewhat liberal extension, whether there was any
evidence warranting the finding that there was reasonable
ground to believe the accused guilty."  *Fernandez v.*

---

[9] As explained further below, it is Sacirbey's contention that the
absence of a court seized of the matter undermines the existence of any
"charge" against him, and would otherwise implicate his right to due
process to the extent he were extradited to a country without any
guarantee that he would have a day in court to defend himself.

[10] There is no dispute here that Judge Maas had jurisdiction over the
matter.

*Phillips,* 268 U.S. 311, 312 (1925); *accord Ahmad,* 910 F.2d at 1064-65.

Significant deference is owed to a magistrate judge's evidentiary determinations in an extradition proceeding. *See Austin v. Healey,* 5 F.3d 598, 605 (2d Cir. 1993) ("The credibility of witnesses and the weight to be accorded their testimony is solely within the province of the extraditing magistrate." (quoting *Quinn v. Robinson,* 783 F.2d 776, 815 (9th Cir. 1986))); *Sandhu v. Burke*, No. 97 Civ. 4608 (JGK), 2000 WL 191707, at * 7 (S.D.N.Y. Feb. 10, 2000) ("[T]he scope of review of the evidentiary findings of the extradition magistrate is quite deferential."); *see also Melia v. United States,* 667 F.2d 300, 302 (2d Cir. 1981) (habeas review "should not be converted into a *de novo* review of the evidence").

By contrast, purely legal questions and mixed determinations of law and fact are reviewed *de novo.* *See Ahmad v. Wigen*, 726 F. Supp. 389, 397 (E.D.N.Y. 1989), *aff'd*, 910 F.2d 1063 (2nd Cir. 1990). On these questions, however, the Court is guided by the longstanding principle that extradition treaties are to be construed liberally in favor of enforcement. *See Factor v. Laubenheimer*, 290 U.S.

17

276, 295 (1933); *Marzook v. Christopher*, No. 96 Civ. 4107 (KMW), 1996 WL 583378, at * 4 (S.D.N.Y. Oct. 10, 1996).[11]

## DISCUSSION

### A.   **Sacirbey Is Extraditable Under the Treaty**

Having lost the issue before Judge Maas, Sacirbey no longer claims that BiH did not succeed to the Treaty. Sacirbey maintains, however, that he is not extraditable pursuant to its terms because he was not "charged" with an extraditable offense.  The Court disagrees.

#### 1. *Sacirbey Was "Charged"*

Article I of the Treaty requires, *inter alia*, that an individual be "charged" with the offense for which extradition is sought.  (*See* Treaty, Art. I.)  The term "charge," in this context, has been interpreted by courts to require something less than a formal charge: for

---

[11] Sacirbey asks this Court to set aside this longstanding principle, on the grounds that: (i) his status as a United States citizen demands a higher level of judicial scrutiny; and (ii) BiH's refusal to extradite its own citizens defeats the policy of reciprocity which underlies the general rule of liberally construing extradition treaties.  Sacirbey's contentions are misplaced.  The matters of his citizenship and any alleged non-reciprocity are properly directed to the State Department, which retains the ultimate decision-making authority over whether to actually extradite a person.  *See Lo Duca v. United States*, 93 F.3d 1100, 1103-04 (2d Cir. 1996) (explaining that pursuant to the Executive Branch's plenary discretion to refuse extradition, "[t]he Secretary of State has final authority to extradite the fugitive, but is not required to do so.").  The judiciary's role, by contrast, is limited to determining whether a person is extraditable.  *See Peroff v. Hylton*, 563 F.2d 1099, 1101-02 (4th Cir. 1977) ("Even if the claimed lack of reciprocity [*i.e.* Sweden's law prohibiting extradition of its own citizens] were construed to be a violation of treaty obligations, it would be for the Executive alone to determine whether to waive such violation or to renounce the extradition agreement." (citing *Charlton v. Kelly*, 229 U.S. 447 (1913)).

example, the requirement has been deemed satisfied where a subject is "accused," *see In re Assarsson*, 635 F.2d 1237, 1242 (7th Cir. 1980), or the requesting nation "intend[s] to prosecute" him, *see Borodin v. Ashcroft*, 136 F. Supp. 2d 125, 129 (E.D.N.Y. 2001) (explaining that the "charge" requirement is satisfied by a requesting nation's intent to prosecute as evidenced by the record." (citations omitted)). *See also In re La Salvia*, No. 84 Cr. Misc. 01 (MHD), 1986 WL 1436, at * 6 (S.D.N.Y. Jan. 31, 1986) (explaining that the word "charged" in a treaty with Argentina is "a generic term referring to those persons whose extradition is sought so that they may be brought to trial . . . .").

Here, the evidence demonstrates that BiH intends to prosecute Sacirbey for the offense of abuse of authority. In addition to the evidence presented to Judge Maas, the Government has offered in this habeas proceeding two letters authored by Amra Kosovic, Counselor to the BiH Embassy in Washington, D.C.  Her first letter, dated October 11, 2005, states that the:

> Ministry of Foreign Affairs of [BiH] informed this Embassy that the [BiH National Court] will proceed in the matter of [Sacirbey] if the request for extradition would be approved by the appropriate authorities of the United States.

Ms. Kosovic's second letter, dated November 10, 2005, clarifies that:

> During the period of justice system reforms, the Court of [BiH] was established and the mentioned Court can, on request of the parties in a case, decide to hear this case of extradition or any other case if the necessary requirements according to the [Criminal Procedure Code], Article 449, sub-article 2 [are met].  As you were informed, [the] Prosecutor's Office of [BiH] [has acknowledged that it] took the investigation which was previous[ly] held by [the] Prosecutor's Office of Canton Sarajevo.

While Sacirbey argues that the language in these letters is conditional and does not indicate a *present* intent by any entity in BiH to prosecute or hear his case, that is simply not so.  The letters plainly indicate a present intent to prosecute Sacirbey in the National Court. While the *effectuation* of that intent is conditioned on Sacirbey's extradition, the intent nevertheless presently exists.

Given that intent, Sacirbey's claim that there is no longer any court currently "seized of the matter" is -- even if accurate -- quite beside the point.[12]  Neither the

---

[12] This issue arises because of BiH's change from a civil law to a common law system since the issuance of the original Demand against Sacirbey, in 2001.  As part of this systemic change, the investigative functions which had been vested in the civil law courts were transferred to independent prosecutors at the cantonal and national levels.  Additionally, a National Court system was established, equivalent to the United States federal court system, and a new National Criminal Code was adopted.  Thus, by the time the United States Government filed the Complaint, the Investigative Office of the Cantonal Court that had issued the Warrant Order no longer had any

Treaty itself nor any body of extradition law requires that there *be* "a court seized of the matter" for extradition to proceed.  All that is required is that Sacirbey be "charged," which he had been at the time his extradition was sought, and continues to be.

### 2. *Sacirbey's Alleged Offense Falls Within the Treaty's Enumerated Offenses*

Contrary to Sacirbey's claim, the Court also finds that the offense of abuse of authority is covered by the Treaty.  Article II of the Treaty enumerates twelve categories of offenses for which extradition may be sought: murder, arson, robbery, forgery, counterfeiting, embezzlement,[13] fraud or breach of trust, perjury, rape, injury to railroads, crimes at sea, and slave trading. (*See* Treaty, Art. II.)

---

power to enforce it.  According to Sacirbey, this means that there is no longer any BiH entity properly authorized to maintain the Request for Sacirbey's extradition.

[13] The following acts and offenses are included within this category:

> *Embezzlement by public officers*; embezzlement by persons hired or salaried, to the detriment of their employers; larceny; obtaining money, valuable securities or other property by false pretenses, or receiving money, valuable securities or other property, knowing the same to have been embezzled, stolen or fraudulently obtained, when such act is made criminal by the laws of both countries and the amount of money or the value of the property fraudulently obtained or received, is not less than two hundred dollars or one thousand francs in gold.

(Treaty, Art. II, ¶ 6) (emphasis added).

While abuse of authority is not specifically
enumerated in the Treaty, it need not be to qualify as an
extraditable offense, so long as the offense charged is
sufficiently equivalent to one or more of the twelve
categories listed.  *See, e.g., In re Extradition of Matus*,
784 F. Supp. 1052, 1052 (S.D.N.Y. 1992) (for a crime to be
extraditable, "'it must be an offense that is either listed
or defined as such by the applicable treaty.'" (quoting
*Spatola v. United States*, 741 F. Supp. 362, 371 (E.D.N.Y.
1990))); *Jhirad v. Ferrandina*, 355 F. Supp. 1155, 1160
(S.D.N.Y.) (holding that non-enumerated offense of "breach
of trust" was "in essence" a crime of "embezzlement," which
was enumerated under the treaty), *rev'd on other grounds*,
486 F.2d 442 (2d Cir. 1973); *In re Extradition of Pineda
Lara*, No. 97 Cr. Misc. 1 (THK), 1998 WL 67656, at * 15
(S.D.N.Y. Feb. 18, 1998) ("There is no requirement . . .
that the crime charged needs to be the mirror image of the
offense listed in the Treaty.").

Here, the Government claims that Sacirbey's alleged
offense of abuse of authority under Article 358 of BiH's
criminal code falls within the Treaty's enumerated offense
of "embezzlement by public officers."  (Treaty, Art. II,
¶ 6.)  Sacirbey claims, however, that these offenses are
not sufficiently equivalent because "embezzlement" requires

a showing of specific intent, whereas no such express
requirement exists for a conviction of abuse of authority.[14]

    Sacirbey's claim falls short.  While "embezzlement"
under the common law generally requires a showing of
specific or fraudulent intent, such *mens rea* often is *not*
required where public officials and public funds are
involved.  29A C.J.S. Embezzlement § 15 ("Under some
statutes, especially those relating to public funds, the
offense [of embezzlement] consists in the violation of the
statute and not the intent or motive by which the accused
is actuated.") (collecting cases).  Indeed, federal
statutory law *defines* certain acts as embezzlement when
public officials and public funds are involved, without
expressly requiring specific intent.  *See, e.g.*, 18 U.S.C.
§§ 643, 648, 650, 652, 653 (all defining misuse of public
funds as "embezzlement"); *see also Shaw v. United States*,
357 F.2d 949, 957-58, n.13 (Ct. Cl. 1966) (explaining that
Congress's definition of certain acts as embezzlement was
designed, in part, to hold public officers to a higher
standard and to eliminate specific intent as a required
element).[15]  Thus, even if abuse of authority does not

---

[14] As noted above, in 2003 Article 358 of the 1998 BiH criminal code was
amended in non-material ways and recodified at Article 359.
[15] While the Supreme Court in *Morissette v. United States*, 342 U.S. 246,
26372 (1952), construed 18 U.S.C. *§ 641* as requiring an element of
willful wrongdoing, that statute is distinguishable (and is not relied

require a showing of specific intent, it still falls within a liberal reading of the Treaty's enumerated offense of "embezzlement by public officers" (Treaty, Art. II, ¶ 6). *See Factor*, 290 U.S. at 295 (instructing extradition courts to construe treaty terms liberally in favor of extradition); *In re Pineda Lara*, 1998 WL 67656, at * 11 (applying principle of construing extradition treaties liberally, and finding that charged offense fell within treaty's enumerated offenses); *Marzook*, 1996 WL 583378, at * 4 (same); *Jhirad*, 355 F. Supp. at 1160 (same).

Moreover, Article 358 may be construed to require a showing of specific intent, notwithstanding the absence of any such express requirement in the terms of the statute. Indeed, the Sarajevo Cantonal Chief Prosecutor, Branko Slijivar, acknowledged that under Article 358, the "prosecution would have to show that the defendant knowingly committed the act charged with the intention of benefiting himself." (*See* Sljivar Decl., ¶ 4, App. Ex. 38); *Cf*. 29A C.J.S. Embezzlement § 15 (explaining that specific intent may be required even where an embezzlement statute

---

upon here) in that it neither requires that the actor be a public official, nor *defines* the proscribed acts as embezzlement, as do §§ 643, 648, 650, 652, 653, for example. Rather, § 641 makes it unlawful for a public officer to "embezzle[], steal[], purloin[], or knowingly convert[]," 18 U.S.C. § 641, all of which in turn require a showing of specific intent under the common law, *see Morissette*, 342 U.S. at 263-72.

is silent in this regard) (collecting cases).  Under that circumstance, abuse of authority clearly falls within the generic common law offense of "embezzlement," and thus easily within the Treaty's scope.[16]

Equally meritless is Sacirbey's reliance on two BiH criminal provisions for which he was *not* charged -- namely Articles 286 and 380 -- which he argues fall more neatly within the Treaty's embezzlement provision.  Specifically, Articles 286 and 380 provide in relevant part as follows:

> [Article 286] Embezzlement -- (1) Whoever, with the intention of making an unlawful material gain for himself or for another person, unlawfully appropriates personal property of another which has been entrusted to him, shall be fined or punished by imprisonment for a term not exceeding one year.
> . . .
>
> [Article 380] Embezzlement in Office --
> (1) Whoever, with an aim of acquiring unlawful property gain for himself or another, appropriates money, securities or other moveables entrusted to him by virtue of his office in the institutions of the Federation of Bosnia and Herzegovina . . . shall be punished by

---

[16] In a similar vein, Sacirbey also notes that Article 358 does not require a showing that the funds at issue were entrusted to the accused.  However, 18 U.S.C. § 643, which expressly provides that a violation of its terms constitutes the crime of embezzlement under United States law, similarly contains no such requirement.  Instead, § 643 requires only that the Government official have received public money which he is not authorized to keep and thereafter have failed to render a proper accounting.  *See* 18 U.S.C. § 643.  It follows that "embezzlement" -- at least as it involves public officers -- does not necessarily require proof that the missing funds were entrusted to the accused.  Moreover, to the extent that abuse of authority is broader than common law embezzlement, the "principle of specialty" may be employed to ensure that Sacirbey is prosecuted only for the act of embezzlement.  *See* Extradition Order, 2005 WL 107094, at * 15.

imprisonment for a term between six months and
five years.

(*See* Hartmann Decl., App. Ex. 30, at 54-55.)[17]

To the extent Sacirbey means to suggest that abuse of
authority cannot be deemed "embezzlement" by dint of the
fact that other BiH statutes are labeled as such, the Court
rejects the claim.  As explained above, statutory labels
are not dispositive in determining whether an offense falls
within the Treaty's enumerated offenses.  Moreover, as
Judge Maas explained, "the fact that conduct may be charged
as a crime under one statute does not mean that the conduct
cannot alternatively be charged under other statutes."
Extradition Order, 2005 WL 107094, at * 13.  Finally, to
the extent that Sacirbey relies on Articles 286 and 380 to
suggest that BiH does not regard abuse of authority to be
in the nature of embezzlement, that plainly is not the
case.  The BiH government is fully cognizant that
Sacirbey's extradition hinges on whether his charged
offense is enumerated in the Treaty.  That BiH has sought
his extradition based on the offense of abuse of authority
-- and has not since modified its charge in the face of
this litigation -- if anything denotes the conviction of

---

[17] These provisions were formerly codified in BiH's 1998 criminal code at
Articles 359 and 221, respectively.

the BiH government that abuse of authority *is* covered under the Treaty as a form of "embezzlement by public officers."

### 3. The Requirement of "Dual Criminality" Has Been Satisfied

Sacirbey also claims that the Extradition Request does not satisfy the dual criminality requirement under the Treaty because abuse of authority does not constitute a crime under either New York state or federal law.  I again agree with Judge Maas, who found Sacirbey's claim in this regard "clearly [] baseless."  *See* Extradition Order, 2005 WL 107094, at * 18.

A finding of dual criminality "does not require that the name by which the crime is described by the two countries shall be the same; nor that the scope of the liability shall be coextensive, or in other respects, the same in the two countries." *Collins v. Loisel*, 259 U.S. 309, 312 (1922).  Rather, "[i]t is enough if the particular act charged is criminal in both jurisdictions." *Id.*; *accord Lo Duca*, 93 F.3d at 1111-12 ("[I]n applying the dual criminality requirement . . . we have never considered only the statutory text.  Rather, we have looked towards the *conduct* of the accused to see if it falls within the proscription of American criminal law.") (emphasis in the original); *Clarey v. Gregg*, 138 F.3d 764, 766 (9th Cir.

27

1998) ("[T]he primary focus [in a dual criminality inquiry] has always been on the conduct charged; the elements of the analogous offenses need not be identical.").

As Judge Maas correctly observed, there are numerous federal crimes for which Sacirbey could have been charged in the United States based on the allegations against him. For example, it is a crime for a federal agent to "receive public money which he is not authorized to retain as salary, pay, or emolument" and "fail[] to render his accounts for the same as provided by law," 18 U.S.C. § 643; and it is a crime for an authorized disbursing officer to "convert[] to his own use . . . any public money entrusted to him, 18 U.S.C. § 653.

Accordingly, the dual criminality requirement is easily satisfied here.

### 4.   The Treaty's "Political Offense" Exception Does Not Apply

Sacirbey claims that he is otherwise protected from extradition under the Treaty's "political offense" exception, which provides:

> A fugitive criminal shall not be surrendered if the offense in respect of which his surrender is demanded be of a political character, or if he proves that the requisition for his surrender has, in fact, been made with a view to try or punish him for an offense of a political character.

(Treaty, Art. VI, ¶ 1.)

There is no dispute that Sacirbey is a public figure who has played a significant role in BiH's political affairs.  The Court also has no reason to doubt Sacirbey's assertion that his roles in public office put him at odds with many powerful members of the Serbian government. Fundamentally, however, Article VI of the Treaty provides an exemption to extradition for political *offenses* -- not political figures.  Here, as Judge Maas properly found, the offense for which Sacirbey is charged simply is not of the type exempted under the Treaty.

The political offense exception generally has been held to apply to two types of crimes: (i) "pure" political offenses that are directed at the state, such as treason and espionage; and (ii) "relative" political offenses, which are "otherwise ordinary crimes that are incidental to the occurrence of severe political disturbances, such as war, revolution and rebellion."  *Marzook v. Christopher*, No. 96 Civ. 4107 (KMW), 1996 WL 583378, at * 2 (S.D.N.Y. Oct. 10, 1996) (citing *Sindona v. Grant*, 619 F.2d 167, 173 (2d Cir. 1980)).

Abuse of authority clearly is not a "pure" political offense, and Sacirbey's claim that it otherwise qualifies as a "relative" political offense is meritless.  To begin

with, criminal conduct "in the nature of financial fraud
. . . traditionally has been considered outside the
'political offense' exception."  Extradition Order, 2005 WL
107094, at * 20 (quoting *Koskotas v. Roche,* 931 F.2d 169,
172 (1st Cir. 1991)); *accord Sindona,* 619 F.2d at 173-74;
*Jhirad,* 536 F.2d at 485.  Financial misconduct is precisely
what the charging documents allege against Sacirbey.  For
example, the Demand alleges that "there is a well founded
suspicion" that Sacirbey "has withdrawn cash by means of
issuing checks and bank orders for cash payable to him or
by means of transferring funds to his own private account,
due to which he caused the total shortage in the amount of
US $610,982.46."  (*See* Demand.)

     While Sacirbey claims that he used the unaccounted-for
money largely in furtherance of BiH's prosecution of war
crimes, this claim amounts, at most, to a political
*defense*.  As the Government explains, however, defensive
allegations cannot transmute an otherwise financial crime
into a political *offense*.  Nor can "[p]olitical motivation
. . . convert every crime into a political offense."
*Ahmad*, 910 F.2d at 1066.  Thus, even if Sacirbey was in
fact using the unaccounted-for money to help fund the
prosecution of war crimes, that is beside the point.
Moreover, Sacirbey's alleged transgressions occurred in

2000, and thus in any event are too distant in time to be considered "incidental to" the conflict in Bosnia which ended in 1995.

Finally, Sacirbey's assertion that the case against him is entirely politically motivated is beyond the purview of this Court's review.  "[I]t is settled law that the political motivations of the requesting state may not be considered by an extradition court;" such considerations are instead reserved for the State Department.  *See* Extradition Order, 2005 WL 107094, at * 21; *accord Eain v. Wilkes*, 641 F.2d 504, 516 (7th Cir. 1981) ("[E]valuations of the motivation behind a request for extradition so clearly implicate the conduct of this country's foreign relations as to be a matter better left to the Executive's discretion."); *Marzook*, 1996 WL 583378, at * 3 (noting that the political offense exception focuses "on the nature of the offense ··· rather than ··· the requesting state's motivation in bringing charges").

Accordingly, Sacirbey is extraditable because he has been charged with a non-political offense that is enumerated in the Treaty.

## B.   The Government Demonstrated Probable Cause

The Court also rejects Sacirbey's challenge to Judge Maas's finding of probable cause.  The narrow function of a

magistrate in an extradition proceeding is to "determine whether there is competent evidence to justify holding the accused to await trial, and not to determine whether the evidence is sufficient to justify a conviction." *Collins*, 259 U.S. at 316; *see also In re Pineda Lara,* 1998 WL 67656, at * 7 (an extradition court's function is to "determine whether there is competent legal evidence to justify extradition according to the [t]reaty [at issue]"); 18 U.S.C. § 3184 (if the extradition court "deems the evidence sufficient to sustain the charge under the provisions of the proper treaty or convention . . . [it] shall certify the same . . . to the Secretary of State").

I am not empowered on habeas review to examine Judge Maas's assessment of the credibility of the various witnesses and documents through which this evidence was offered. *See Austin,* 5 F.3d at 605 ("The credibility of witnesses and the weight to be accorded their testimony is solely within the province of the extraditing magistrate."). Rather, my function is to determine whether, after giving appropriate deference to Judge Maas factual findings, the evidence reasonably shows that there is probable cause to believe that Sacirbey committed the crime for which his extradition is sought. *See Ahmad*, 726 F. Supp. at 399-400. That standard is easily met here.

Judge Maas found that the evidence submitted by the Government established that: (i) there were significant shortfalls in the Mission's account, over which Sacirbey had signature authority; (ii) Sacirbey refused to explain certain non-routine expenditures to Ministry representatives, even though BiH procedures do not allow for confidential expenditures; (iii) President Izetbegovic expressly denied that Sacirbey had been authorized to spend BiH funds on the ICJ and ICTY cases; (iv) Sacirbey represented that he would be able to restore some of the missing funds, but then failed to do so; (v) he may have evaded the efforts of BiH authorities to question him about the accounting problems; and (vi) he failed to account properly for personal advances that he had taken against the Mission account.

This evidence clearly supports Judge Maas's determination that "a finder of fact reasonably could conclude that Sacirbey embezzled funds from the Mission account and used them for his own personal needs." Extradition Order, 2005 WL 107094, at * 19.[18]

---

[18] Sacirbey's claim that no probable cause exists, on the ground that there is no evidence that he *intended* to embezzle funds, is specious. Under Sacirbey's own theory, intent is not an element of abuse of process. *See supra* Section A.2.  In any event, and to the extent that abuse of authority may require a showing of specific intent, *see id.*, the evidence clearly is sufficient to support a finding of probable cause to believe that Sacirbey intended to embezzle BiH funds.

**C.   Sacirbey's Constitutional Arguments are Unavailing**

Sacirbey argues that his right to due process was violated by virtue of: (i) the Government's refusal to produce any evidence relating to the role of any United States officials in preparing or pursuing BiH's Request for extradition; and (ii) Judge Maas's refusal to reopen the hearing to allow Sacirbey's expert to submit a reply declaration to the expert declaration submitted by the Government concerning BiH law.

At the outset, it bears emphasis that the evidentiary rulings of extradition courts are generally not subject to habeas review. *See Charlton v. Kelly*, 229 U.S. 447, 457 (1913) ("Mere errors in the rejection of evidence are not subject to review by a writ of habeas corpus."); *Messina v. United States*, 728 F.2d 77, 80 (2d Cir. 1984) ("[T]he wrongful exclusion of specific pieces of evidence, however important, does not render the detention illegal" (citing Collins, 259 U.S. at 316)); *see also In re Sindona*, 450 F. Supp. at 685 ("The extent of [] explanatory evidence to be received is largely in the discretion of the judge ruling on the extradition request."). Nevertheless, because habeas jurisdiction generally extends to review of constitutional claims, the Court will review Sacirbey's challenges to the limited extent that they implicate due

process concerns.  *See, e.g., Gill*, 747 F. Supp. at 1039-40
(addressing extraditee's alleged due process challenges).

        The procedural process that is due to extraditees is
limited.  Pursuant to 18 U.S.C. § 3184 Congress has
afforded putative extraditees a hearing before a judicial
officer, *e.g.*, a magistrate judge, who determines whether
the "evidence is sufficient to sustain the charge under the
provision of the proper treaty."  18 U.S.C. § 3184.
Fundamentally, an extradition hearing conducted pursuant to
this statute is not a criminal proceeding, but rather "a
preliminary examination to determine whether a case is made
out which will justify the holding of the accused and his
surrender to the demanding nation."  *Lo Duca*, 93 F.3d at
1104 (quoting *Ward v. Rutherford*, 921 F.2d 286, 287 (D.C.
Cir. 1990)).

        As relevant here, "[t]he evidentiary rules of criminal
litigation are not applicable."  *Messina*, 728 F.2d at 80
(citation omitted).  Thus, for example, "a defendant has no
right to cross-examine witnesses or introduce evidence to
rebut that of the prosecutor."  *Id.*  Rather, a putative
extraditee *may* be permitted -- "in the exercise of the
extraditing judge's discretion" -- to offer only
"explanatory" evidence.  *Id.; see also Sandhu*, 2000 WL
191707, at * 6 ("In each case, the task of defining the

precise boundary between admissible 'explanatory' evidence and inadmissible 'contradictory' evidence is entrusted to the sound discretion of the extradition judge." (citing *Shapiro v. Ferrandina,* 478 F.2d 894, 904 (2d Cir. 1973)).[19]

It is in this context that the Court turns to Sacirbey's purported due process challenges, and finds them to be meritless.

### 1. The Government's Refusal to Produce the Requested Materials Did Not Violate Sacirbey's Right to Due Process

In anticipation of the extradition hearing before Judge Maas, Sacirbey requested that the Government produce information regarding: (i) the role of any United States official in preparing the Request for Extradition; (ii) the role of any United States official in pursuing the matter with the investigative court or officials of BiH's Foreign Ministry; and (iii) any understandings or deals between BiH

---

[19] The decisions in this area have focused generally on the accused's right to present factual evidence to undermine the Government's showing of probable cause. *See*, *e.g.*, *In re Sindona,* 450 F. Supp. at 685. As the court in *In re Sindona* explained:

> In admitting 'explanatory evidence,' the intention is to afford an accused person the opportunity to present reasonably clear-cut proof which would be of limited scope and have some reasonable chance of negating a showing of probable cause. The scope of this evidence is restricted to what is appropriate to an extradition hearing. The decisions are emphatic that the extraditee cannot be allowed to turn the extradition hearing into a full trial on the merits.

450 F. Supp. at 685.

and United States officials regarding his sought-after
extradition.  The Government refused Sacirbey's requests on
the ground that there is no provision for discovery in an
extradition proceeding.

Sacirbey now argues in his habeas petition that the
information he requested should have been produced as
exculpatory evidence under the principles articulated in
*Brady v. Maryland*, 373 U.S. 83 (1963) (holding that
prosecution's suppression of evidence favorable to a
criminal defendant violates due process where evidence
requested is material either to guilt or punishment).
While this argument has found some traction in the Sixth
Circuit, *see Demjanjuk v. Petrovsky,* 10 F.3d 338 (6th Cir.
1994) (holding that *Brady* material is discoverable in
extradition context), it has not been adopted in the Second
Circuit, *cf. Messina,* 728 F.2d at 80 (affirming the
district court's rejection of extraditees' request for
discovery of tape recordings relating to their extortion
charges).  *See also Montemayor v. United States*, 329 F.
Supp. 2d 883, 888 (S.D. Tx. 2004) ("The extradition law,
the extradition treaty, and the United States Constitution
do not require production of exculpatory evidence at an
extradition hearing.").

37

Even if *Brady* can be said to apply in the extradition context -- and the Court is skeptical that it does or should -- *Brady* would not extend to Sacirbey's discovery requests in any event.  That is because Sacirbey's requests were directed not at *exculpatory* evidence, but rather information regarding the political motivations, if any, behind BiH's request for his extradition.  As explained above, however, the possibility that his extradition request might have been politically motivated is beyond the fact-finding role of a magistrate judge, which is to determine whether probable cause has been demonstrated. Moreover, to the extent that Sacirbey otherwise sought to obtain and introduce the evidence (if any exists) for "explanatory" purposes, it was well within Judge Maas's considerable discretion to disallow it.  *See Messina*, 728 F.2d at 80.

### 2. Judge Maas's Denial of Sacirbey's Request to Reply to the Sljivar Declaration Did Not Violate Sacirbey's Right to Due Process

As noted above, Sacirbey also argues that he was deprived of due process on the ground that his hearing was rendered fundamentally unfair, in that Judge Maas denied Sacirbey's request to submit a reply declaration to that of the Government's expert, Branko Sljivar. (*See* Government Letter, dated March 12, 2004, and Sljivar Declaration, App.

Ex. 38.)  The Sljivar declaration was offered to show that the crime of abuse of authority is "so similar as to be nearly indistinguishable" from the crime of embezzlement in office, and therefore extraditable under the treaty.  (*Id.*)

Sacirbey's claim falls far short because, if for no other reason, he has failed to demonstrate that he was prejudiced by Judge Maas's ruling in this regard. Sacirbey was afforded the opportunity to, and did, submit evidence from his own legal expert, Michael Hartmann.  (*See* App. Exs. 30-31.)  Nowhere does Sacirbey explain what additional evidence Hartmann would have offered in another declaration, much less how it would have made any difference in the outcome.

On this record it cannot be said that Sacirbey's right to due process was violated by Judge Maas's refusal to allow Sacirbey to submit a reply to the Sljivar declaration.

### 3. The So-Called "Gallina Exception" Does Not Apply

Finally, Sacirbey contends that Judge Maas's order should be reversed in light of the alleged danger and deprivation of due process Sacirbey would face if he were extradited.  Specifically, he asserts that because there is no Court in BiH seized of the matter, he ostensibly could be imprisoned indefinitely without ever seeing a judge,

39

without any recourse, on the whim of whichever prosecutor

now has control of the investigation, and under the

pressure of his political enemies.[20]

Once again, Sacirbey's claims are misplaced.  Under

the well-entrenched rule of non-inquiry, the judicial

officer charged with determining extraditability is "not

permitted to inquire into the procedures that will be

followed in the requesting country or the degree of risk

that the extraditee would face after extradition."  *Sandhu*,

2000 WL 191707, at * 7 (citing *Ahmad,* 910 F.2d at 1066); *In

re Cheung,* 968 F. Supp. 791, 798-99 (D. Conn. 1997).

This rule applies with equal force on habeas review.

*See Ahmad,* 910 F.2d at 1066-67; *Sandhu*, 2000 WL 191707, at

* 7.  That is because habeas review "tests only the

legality of the extradition proceedings; [whereas] the

question of the wisdom of extradition remains for the

executive branch to decide."  *Sindona*, 619 F.2d at 174

(citing *Wacker v. Bisson*, 348 F.2d 602, 606 (5th Cir.

1965)).  Such discretion is vested in the Secretary because

the extradition decision "implicates questions of foreign

---

[20]     Although Sacirbey did not raise this issue below, the Court will
nevertheless consider it to the extent it implicates constitutional
questions.  *See Austin,* 5 F.3d at 601 (exercising discretion to
consider claims raising purely legal or constitutional issues, noting
that for constitutional claims, notions of forfeiture or waiver "cannot
be dispositive." (quoting *Commodity Futures Trading Comm'n v. Schor,*
478 U.S. 833, 851 (1986))).

policy which are better answered by the executive branch
than by the judiciary." *Sandhu*, 2000 WL 191707, at * 7;
*accord Kin-Hong,* 110 F.3d 103, 111 (1st Cir. 1997).  As the
First Circuit in *Kin-Hong* explained, in terms fully
applicable here:

> The rule of non-inquiry, like extradition
> procedures generally, is shaped by concerns about
> institutional competence and by notions of
> separation of powers.  It is not that questions
> about what await[s] the relator in the requesting
> country are irrelevant to extradition; it is that
> there is another branch of government, which has
> both final say and greater discretion in these
> proceedings, to whom these questions are more
> properly addressed.

*Kin-Hong,* 110 F.3d at 111.

Relying on *dicta* from *Gallina v. Fraser,* 278 F.2d 77
(2d Cir. 1960), Sacirbey nevertheless claims that the rule
of non-inquiry should yield in light of the circumstances
of his case.  In *Gallina*, the Second Circuit applied the
rule of non-inquiry, but acknowledged that it could
"imagine situations where the [petitioner], upon
extradition, would be subject to procedures or punishment
so antipathetic to a federal court's sense of decency as to
require reexamination" of the rule.  *Id.* at 79.
The so-called "*Gallina* exception" exists only in *dicta*.
Sacirbey has come forth with no case actually applying the
exception, nor has this Court discovered any.  *Cheung*, 968

F. Supp. at 799 ("The '*Gallina* exception' to the rule of non-inquiry has yet to be applied."). Indeed, the Second Circuit has strongly suggested that the *Gallina* exception should never apply. *See Ahmad*, 910 F.2d at 1066 ("[C]onsideration of the procedures that will or may occur in the requesting country is not within the purview of a habeas corpus judge."); *Gill,* 747 F. Supp. at 1050 ("This lower court . . . is bound by [*Ahmad*] and must therefore decline to inquire further -- or direct further inquiry -- into the conditions [extraditees] may confront should they be extradited . . . ."); *In re Sandhu,* 1996 WL 469290, at * 5 (explaining that "[t]he Second Circuit now treats the non-inquiry doctrine as absolute").

Contrary to Sacirbey's claim, his status as a United States citizen is a consideration for the State Department, not this Court. *See Ahmad*, 910 F.2d at 1066 (applying rule of non-inquiry to naturalized United States citizen). And while the harm Sacirbey fears that he will be subjected to is serious, courts have routinely applied the rule of non-inquiry in the face of allegations of equal or worse treatment. *See, e.g., Sindona,* 619 F.2d at 174 (upholding order of extradition despite allegations that extraditee faced risk of murder or injury at the hands of his political enemies); *Sandhu*, 2000 WL 191707, at ** 4, 7-9)

42

(same where extraditee claimed he would be tortured upon his return to India).  Ultimately, Sacirbey must look to the assurances of the *Kin-Hong* court that the Secretary of State, should she ultimately decide to extradite him, "may attach conditions to [his] surrender," or may "elect to use diplomatic methods to obtain fair treatment" for him.  *See Kin-Hong*, 110 F.3d at 110.

## CONCLUSION

For the foregoing reasons, Sacirbey's habeas petition is DENIED.

**SO ORDERED:**

Barbara S. Jones
**UNITED STATES DISTRICT JUDGE**

Dated:    New York, New York
          September 7, 2006

43